UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| **Christy E. Butler,** | * |
| | * |
|     **Plaintiff,** | * |
| | * |
| v. | *   No.   2:19-cv-2577 |
| | *   **Jury Demanded** |
| **Steven T. Mnuchin,** | * |
|     **Secretary of the Treasury,** | * |
| | * |
|     **Defendant.** | * |

## VERIFIED COMPLAINT

COMES NOW Plaintiff Christy E. Butler (hereinafter referred to as "Ms. Butler" or "Plaintiff"), by and through Counsel, and for her Complaint against Defendant Steven T. Mnuchin, Secretary of the Treasury, states as follows:

### NATURE OF THE COMPLAINT

1. Ms. Butler brings this case for harassment and hostile work environment based on disability, and for retaliation for engaging in protected activity.

2. Specifically, Defendant's conduct violates the Rehabilitation Act of 1973, 29 U.S.C. § 706, 791-794.

3. The Department of the Treasury issued a Final Agency Decision ("FAD") on June 13, 2019. Ms. Butler, through counsel, received the Department of the Treasury's FAD on June 19, 2019.

4. As required under 29 C.F.R. § 1614.407(a), Ms. Butler brings this Complaint within 90 days of receipt of the Treasury Department's FAD, seeking relief from Defendant's ongoing harassment, discrimination and retaliation.

## PARTIES

5. Plaintiff Christy E. Butler is an adult resident of Memphis, Shelby County, Tennessee.

6. Defendant conducts business in this judicial district.

7. At all times relevant to this Complaint, Plaintiff and Defendant had an employee/employer relationship as contemplated in the Rehabilitation Act.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this matter pursuant to 26 C.F.R. § 1614.407(a) and because Plaintiff's claims raise federal questions.

9. Personal jurisdiction and venue are proper in this Court because Defendant may be found here, conducts business here, and the facts and circumstances which gave rise to the causes of action contained in this Complaint arose occurred in Shelby County, Tennessee, in this Judicial District.

## FACTUAL BACKGROUND

10. Defendant employed Ms. Butler beginning in May 2013.

11. Ms. Butler was initially hired by Defendant as Internal Revenue Service Correspondence Examination Technician.

12. Ms. Butler has had cerebral palsy, a physical disability which restricts her mobility, since birth.

13. Ms. Butler disclosed her medical condition at the time of her hiring.

14. Ms. Butler's disability is immediately apparent when she meets someone for the first time, as she requires the use of a wheelchair.

15. Shortly after Ms. Butler was hired, Mr. John Wigley, Manager SB/SE (Small Business/Self Employed), asked her, "Are you sure you want this job?"

16. Ms. Patricia Smith, then-Manager SB/SE, asked Ms. Butler on her third day of training if she wanted to be a clerk instead of a Tax Examiner.

17. These comments by management are discriminatory and demonstrate prejudice against Ms. Butler from the first days of Ms. Butler's employment.

18. Ms. Butler's coworkers and supervisors made similar comments to her, which also demonstrate an active animus against Ms. Butler based on her disabilities.

19. For instance, Damone Daniels, Operations Manager and one of Ms. Butler's supervisors, called Ms. Butler "medically incompetent" and stated that she was incapable of performing her job, in spite of Ms. Butler's treating physician's statements that she is in fact capable of performing the essential duties of her position with reasonable accommodations.

20. Upon its hiring of Ms. Butler, the IRS was required to modify a restroom to make it accessible to Ms. Butler, given her impairment and use of a wheelchair.

21. Durrow Robinson, Facilities Management and Security Service (FMSS) Manager, who was charged with modifying the restroom, delayed the modification unnecessarily, making it nearly impossible for Ms. Butler to relieve herself while at work.

22. As a result of this long delay, Ms. Butler was forced to either find a humiliating "work around" so that she could relieve herself, or simply forego using the restroom at work entirely, causing her medical harm.

23. When Robinson was finally forced to make the restroom modification, he made multiple comments to Ms. Butler indicating he has an active animus against individuals with

physical disabilities, including, but not limited to, stating that he has disabled individuals in his family who do not require extensive assistance or restroom accommodations, and that Ms. Butler was seeking special treatment.

24. Similarly, Mr. Robinson unnecessarily delayed providing Ms. Butler with a cubicle that was both large enough to accommodate her wheelchair and was near her team in the Small Business/Self Employed business unit.

25. While Ms. Butler was on approved FMLA leave from May through November 2017, made necessary by the stress of enduring IRS management's discriminatory and retaliatory treatment of her, Dennis Krings, Director of the Small Business/Self Employed department, repeatedly called her and demanded she come into work in order to fill out her FMLA paperwork, although she had already submitted the requisite paperwork.

26. During Ms. Butler's FMLA leave, Daniels continued his discriminatory treatment of Ms. Butler by attempting to pressure her into resigning.

27. Daniels threatened Ms. Butler's job and offered her three, "options": (1) Ms. Butler could resign, (2) be put on underperforming status upon her return from FMLA, or (3) request disability retirement to preserve her work record.

28. Ms. Butler's performance reviews have been consistently excellent over the course of her employment with the IRS and therefore any imposition of an "underperforming" status was entirely unsubstantiated.

29. These options were provided to Ms. Butler instead of the reasonable accommodations Ms. Butler requested on a number of occasions.

30. Other non-disabled employees were not offered these "options" as a result of their opposition to discriminatory actions.

31. On or about April 19, 2018, Ms. Butler submitted an e-mail request to Lynette Hernandez to withdraw any disability retirement paperwork she submitted under extreme duress based on Damone Daniel's discriminatory and retaliatory treatment.

32. Ms. Butler's retirement paperwork was finally withdrawn in December 2018, immediately before the government shutdown/furlough, and only then upon the intervention of her attorney.

33. In or about August 2017, Ms. Butler contacted the office of Congressman Steve Cohen to report the above-described discriminatory treatment.

34. Based on Ms. Butler's complaint, Congressman Cohen's office conducted an investigation, which was under way upon Ms. Butler's return to work at the conclusion of her FMLA leave in November 2017.

35. As a result of the investigation, Damone Daniels disbanded Ms. Butler's work team in Correspondence Tax Examination where Ms. Butler had been originally assigned, under the pretext of "realignment."

36. Ms. Butler, along with a few people from her previous team, were assigned to a Batch Team in the Small Business/Self Employed Unit on or about January 21, 2018.

37. However, Ms. Butler's new team was relocated to another area on the floor, and Ms. Butler remained in her original cubicle.

38. Ms. Butler is now some fifty yards away from her new team members, who are placed in close proximity to one another to facilitate the exchange of information pertinent to their various tasks and duties.

39. None of Ms. Butler's team members or managers are even within her line of sight.

40. As a result, Ms. Butler has been isolated and ostracized because of her disability and because she engaged in protected activity by reporting the Service's actions to Congressman Cohen.

41. Other, non-disabled employees and employees who have not engaged in protected activity were stationed with their teams and were not isolated from their business units/teams.

42. Ms. Butler was harmed and continues to be harmed by an increased difficulty in communicating with her team members as a result of the increased distance from her coworkers, thereby making it more difficult for Ms. Butler to complete her tasks.

43. In or about April 2018, Ms. Butler was locked out of the restroom that had been modified for her use.

44. This restroom was locked from the inside for approximately two days.

45. Other non-disabled employees and those who have not engaged in protected activity were not locked out of the only restrooms they could use, nor were they restricted to the use of only one restroom.

46. Ms. Butler sustained a urinary tract infection as a result of her denied access to the only restroom in the building accessible to someone in her condition.

47. Since January 2018, John Wigley, Manager SB/SE, has refused to post Ms. Butler's annual performance review for 2017 to HR Connect, the IRS's customized information portal for IRS employees and HR administrators.

48. As a result of this refusal, Ms. Butler has not been eligible for her annual step increase or consideration for an award/raise.

49. Other non-disabled employees and those who have not engaged in protected activity were not effectively denied an annual performance review.

50. This ongoing refusal also impairs Ms. Butler's ability to apply for higher-graded positions within the Department of the Treasury and thus inhibits her ability to advance her career.

51. While Ms. Butler was out on FMLA leave, and after Ms. Butler engaged in protected activity by making a complaint to Congressman Steve Cohen's office concerning the discrimination Ms. Butler was facing on the basis of her physical disability, Damone Daniels changed Ms. Butler's work schedule to 10:00 a.m. to 6:00 p.m.

52. Other non-disabled employees and those who have not engaged in protected activity did not have their work schedules unilaterally changed.

53. Ms. Butler was harmed by this change in her work schedule, as it barred her access to public transportation sufficient to meet her needs as an individual with a mobility impairment.

54. Ms. Butler's ability to get to work depends at least in part on the availability of a MataPlus bus to accommodate wheelchair access.

55. The MataPlus bus does not run at times that allowed her to arrive at work for her 10:00 am to 6:00 pm work schedule.

56. Instead, Ms. Butler had to arrive so early to work she sat in her cubicle for hours until her scheduled workday began.

57. Ms. Butler's work schedule was returned to 7:00 a.m. to 3:30 p.m. on or about March 12, 2018 only after Mr. Daniels was assigned to another department, and after Ms. Butler

made her complaint on January 26, 2018 to Brenda Dial, Director in Examination SB/SE and others.

58. In or about June 2017, while she was out on FMLA leave, Ms. Butler submitted a Request for Reasonable Accommodation based on her physical disability, seeking to be assigned to a different position.

59. Shauna Harris, Reasonable Accommodation Coordinator, informed Ms. Butler that the only available position for which Ms. Butler was qualified was a seasonal clerk position which came with a severe reduction in Ms. Butler's grade and step as a government employee, a lower pay grade, and no benefits.

60. A few months later, Ms. Butler attempted to open a new Request for Reasonable Accommodation in order to continue her pursuit of a new position and was again told that the only position was the seasonal clerk position previous discussed.

61. Contrary to what management told Ms. Butler, based on positions posted on U.S.A. Job website, there were open positions available within IRS for which Ms. Butler was qualified.

62. Ms. Butler was harmed by management's refusal to act on her Requests for Reasonable Accommodations as she was forced to remain in a position where she was and continues to receive on-going harassment and discriminatory treatment based on her physical disability and engagement in protected activity.

63. Since 2015, Ms. Butler has made multiple requests for reasonable accommodations for tools necessary to perform the tasks associated with her position.

64. Specifically, Ms. Butler has requested that the Service's computer programs be made compatible with the Dragon Naturally Speaking software which Ms. Butler uses to perform phone duties associated with her daily tasks.

65. To date, the Service's phone system is not yet compatible with the Dragon Naturally Speaking software.

66. Further, the Service is in the process of updating its phone systems and has made no representations to Ms. Butler in the course of training whether the Dragon Naturally Speaking software will be compatible with the new system.

67. Other non-disabled employees and those who have not engaged in protected activity have not consistently been denied the use of the tools they need to perform their job duties.

68. The Service's ongoing refusal to establish compatibility with the Dragon Naturally Speaking software has injured Ms. Butler by making it more difficult for her to perform her job duties.

69. During her assignment to the Correspondence Tax Examination team, Ms. Butler repeatedly requested to be assigned tasks within her job description and that were comparable to the other tasks assigned to her team.

70. Other members of Ms. Butler's Correspondence Tax Examination team were assigned tasks with substantially less phone duties than Ms. Butler.

71. Ms. Butler has deliberately and disproportionately been assigned tasks with more phone duties than other, non-disabled employees and employees who have not engaged in protected activity who hold the same job title.

72. Ms. Butler was physically harmed by receiving an assignment with excessive phone duties, as her disability causes her difficulty in speaking for extended periods of time.

73. In or about March 2018 and in conjunction with the informal phase of the EEO investigation into her complaints, Ms. Butler requested to be moved into a position in the Monitoring Offer in Compromise (MOIC) department.

74. Ms. Butler sought this transfer as a remedy to the ongoing harassment, discrimination, retaliation, and humiliation she was enduring on a daily basis.

75. Ms. Butler had consulted with Demetria Brown, a MOIC manager, and a quality analyst with MOIC, who both stated that a shadowing opportunity was available to anyone who requested one.

76. Ms. Brown then instructed Ms. Butler to have her manager, Ulysses Noel, Manager SB/SE, contact her to coordinate a shadowing opportunity in MOIC.

77. However, after Ms. Butler contacted Mr. Noel to request the shadowing opportunity in conjunction with her request to move to MOIC, Mr. Noel stated he consulted with Ms. Brown and the shadowing opportunity could not be conducted while Ms. Butler was on duty.

78. This essentially meant that Ms. Butler could not take advantage of the shadowing opportunity in MOIC, as Ms. Butler's regular work schedule and the shadowing opportunity ran concurrently.

79. However, Ms. Butler consulted again with Ms. Brown, who stated that Mr. Noel was incorrect, and shadowing opportunities may be conducted during an employee's regular work day.

80. When she then approached the MOIC operations manager, she was told there were no shadowing opportunities available, in direct contradiction to what she had been told by Ms. Brown.

81. At the conclusion of the informal phase of the EEO process, Ms. Butler's request to move to MOIC as a remedy was denied by Mr. Dennis Krings, Campus Director, who claimed that he did not have the authority to move Ms. Butler into the position she sought.

82. Other non-disabled employees and those who have not engaged in protected activity have had their requests for shadowing opportunities and requests for transfers honored in a timely manner.

83. Ms. Butler has been injured by the refusal to move her into the MOIC position and the denial of the MOIC shadowing opportunity, as she is still subject to ongoing discrimination, harassment, and humiliation on the basis of her disability and retaliation for engaging in protected activity.

## Count I
### Violation of Rehabilitation Act of 1973, 29 U.S.C. § 706, 791-794

84. Ms. Butler incorporates by reference the allegations contained in paragraphs 1-82 of her Complaint as though they were fully set forth herein.

85. Section 501 of the Rehabilitation Act of 1973 prohibits employment discrimination against qualified individuals with disabilities in the federal sector.

86. Under § 501(f) of the Rehabilitation Act, the standards used to determine whether employment discrimination has occurred under the Act are the same as those applied under the Americans with Disabilities Act of 1990 (ADA).

87. The Rehabilitation Act prohibits federal employers from retaliating against disabled employees for participation in proceedings under the Act or who opposed any practice made unlawful under the Act.

88. The Rehabilitation Act requires that federal employers make reasonable accommodation to a known physical or mental limitation of an otherwise qualified individual with a disability, unless such accommodation results in undue hardship.

89. Because Ms. Butler has cerebral palsy, a physical disability which restricts her mobility, she is a member of a protected class under the Rehabilitation Act.

90. Defendant violated Ms. Butler's rights under the Rehabilitation Act by denying her the same rights and privileges as other similarly similarly-situated non-disabled employees, including being stationed in close proximity to her team members, having unfettered use of an accessible restroom, receiving an annual performance review, having use of the tools to perform assigned job duties, and enjoying opportunities for career advancement through showing and departmental transfers.

91. Defendant violated Ms. Butler's rights under the Rehabilitation Act by imposing burdens upon her more onerous than that of similarly situated non-disabled co-workers, including limiting her job options, unilaterally changing her work schedule, and being given tasks with disproportionately more phone duties.

92. Defendant violated Ms. Butler's rights under the Rehabilitation Act which requires employers to make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an employee, including long and unnecessary delay in restroom modification and failure to provide her with appropriate voice-recognition software.

93. Ms. Butler sustained substantial monetary and non-monetary damages as a result of Defendant's illegal conduct, and Ms. Butler demands such legal and equitable relief as

will effectuate the purposes of the Rehabilitation Act, including, but not limited to, the following:

    a. Compensatory damages;

    b. Punitive damages;

    c. Costs and attorney's fees;

    d. Appropriate affirmative action;

    e. Equitable relief;

    f. Accrual of lost earning and fringe benefits; and

    g. Any other relief that this Court deems just and equitable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

1. An award of damages, including liquidated damages, to be paid by Defendant;

2. An award of Plaintiff's loss of earnings and fringe benefits and compensatory damages in the form of future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other non-pecuniary losses under federal law;

3. Costs and expenses of this action incurred herein, including reasonable attorneys' fees and expert fees;

4. Pre-Judgment and Post-Judgment interest, as provided by law; and

5. Any and all such other and further legal and equitable relief as this Court deems necessary, just, and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all causes of action and claims with respect to which she has a right to jury trial.

Dated:  August 29, 2019                              Respectfully submitted,


                                                s/ Philip Oliphant_____
Alan G. Crone, Esq. (TN Bar. No. 14285)
Philip E. Oliphant, Esq. (TN Bar No. 25990)
The Crone Law Firm, PLC
88 Union Avenue, 14th Floor
Memphis, TN 38103
(901) 737-7740 (voice)
(901) 474-7926 (fax)
acrone@cronelawfirmplc.com (email)
poliphant@cronelawfirmplc.com (email)

*Attorneys for Plaintiff*